**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-0724-17T1
               A-4002-17T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

REHAN ZUBERI, a/k/a RAY Z
and RAY ZUBERI,

    Defendant-Appellant.

Argued September 12, 2019 – Decided November 8, 2019

Before Judges Alvarez, Nugent and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Indictment No. 15-05-0453 and Bergen County, Indictment No. 13-08-0140.

Adam W. Toraya argued the cause for appellant.

Sarah D. Brigham, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Sarah D. Brigham, of counsel and on the briefs).

PER CURIAM

Defendant Rehan Zuberi appeals two judgments of conviction (JOC), one entered on September 6, 2017, in Morris County and the other on January 26, 2018, in Bergen County. Defendant entered guilty pleas and was sentenced accordingly. We consolidate the matters for decision and affirm.

Defendant's prior court history consists of a 1995 arrest for theft of services, N.J.S.A. 2C:20-8(a), criminal attempt, N.J.S.A. 2C:5-1, and a charge described in the presentence report as "medical assistance benefits, N.J.S.A. 30:4D-17." In 1997, defendant was convicted of second-degree theft by deception, N.J.S.A. 2C:20-4, and second-degree money laundering, N.J.S.A. 2C:21-25. Those convictions related to Medicaid fraud, leading to defendant's lifetime ban from owning or operating medical facilities.

Defendant's wrongdoing in Morris County arises partially from that ban. He concealed his ownership and management control of various medical imaging centers behind others, including his wife, family members, and friends. Defendant's criminal enterprise, and multiple medical imaging centers earned millions of dollars in illegal profits. Defendant also engaged in medical kickbacks, bribing dozens of doctors in exchange for patient referrals to his imaging centers. In Bergen County, defendant was paid on a false insurance claim for magnetic resonance imaging equipment.

Defendant, along with twenty-two others, was originally charged in Morris County with multiple offenses:[1] racketeering, N.J.S.A. 2C:41-2(a) (count one); first-degree financial facilitation, N.J.S.A. 2C:21-25(c) (count two); commercial bribery, N.J.S.A. 2C:21-10(c) (count three); deceptive business practices by making a false or misleading written statement, N.J.S.A. 2C:21-7(h) (count four); violating a state medical assistance program, N.J.S.A. 30:4D-17 (count five); misconduct by a corporate official for operating a corporation to further and promote a criminal objective, N.J.S.A. 2C:21-9(c) (count six); failure to file a state tax return with intent to defraud the State, N.J.S.A. 54:52-8 (count seven); and failure to pay income taxes, N.J.S.A. 54:52-9 (count eight).

In Bergen County, defendant was indicted for second-degree conspiracy to commit forgery, N.J.S.A. 2C:5-2 and 2C:21-1 (count one); second-degree insurance fraud, N.J.S.A. 2C:2-6 and 2C:21-4.6(b) (counts two and six); second-degree theft by deception, N.J.S.A. 2C:2-6 and 2C:20-4 (counts three and seven); and fourth-degree forgery, N.J.S.A. 2C:2-6 and 2C:21-1(a)(2) (counts four, five, eight, and nine).

---

[1] The degree of offenses is not specified in the record but is not relevant to our decision. They provide context for what followed.

On May 4, 2015, in Morris County, the State and defendant agreed defendant would plead guilty by way of accusation to first-degree financial facilitation, and second-degree conspiracy to commit financial bribery. The recommended sentence was no more than ten years in prison, with four years of parole ineligibility on the first-degree offense.

The agreement further provided that for every five individuals prosecuted based on defendant's cooperation, his term of imprisonment would be reduced by six months, and his parole ineligibility term by four months, to a maximum possible reduction to eight years with thirty-two months of parole ineligibility. For the second-degree conspiracy, a concurrent ten-year term would be imposed, subject to the same conditions.

Thus the aggregate term, if defendant did not cooperate, would be ten years subject to four years of parole ineligibility. The minimum reduced sentence would be eight years with thirty-two months of parole ineligibility.

During the plea colloquy, defendant acknowledged his knowing, voluntary, and intelligent waiver of his right to trial. The colloquy included the following:

> Q    Did you commit these offenses to which you are pleading guilty?
>
> A    Yes, I did.

A-0724-17T1

We reproduce the direct examination of defense counsel, as interrupted where indicated by the judge and the prosecutor:

Q      [Defendant], between approximately 2006 and 2015 did you own a management company?

A      2007 and '14, yes.

Q      And what was the name of that management company?

A      Diagnostic Imaging Affiliates.

Q      And did that company manage and operate medical imaging centers?

A      Yes, it did.

Q      And what were the name of some of those medical imaging centers that it managed and operated?

A      American Imaging and Medical and Molecular Imaging.

Q      Okay. Between approximately 2008 and 2014 did you engage in financial transactions in connection with Diagnostic Imaging Affiliates?

A      Yes, I did.

Q      And were these transactions involving amounts of money which you believed to be derived from criminal activity?

A      Yes.

5

Q     And was the total amount of money involved in those financial transactions over $500,000?

A     Yes, it was.

Q     And were you attempting to conceal or disguise the source of those funds in the course of those transactions?

A     Yes.

Q     And you believed that that money was obtained from criminal activity.  Is that correct?

A     That's correct.

Q     And was the criminal activity healthcare claims fraud?

A     Yes.

Q     The healthcare claims fraud was based on the altering of the locations where MRI services were provided.  Is that correct?

A     That's correct.

Q     And when you alter the location of an MRI, you're changing the actual reimbursement rate.  Is that correct?

A     That's correct.

Q     And when you change the reimbursement rate, you're actually receiving more money than you would normally be entitled to.  Is that correct?

A     That's correct.

A-0724-17T1

Q     Specifically with respect to changing the locations, where were the actual services provided?

A     The services were provided in Hackensack and billed out of Englewood, New Jersey.

Q     And as a result you obtained more money?

A     That's correct.

Q     And you engaged in financial transactions with that money.

A     Yes.

Q     Is that correct?

A     Yes.

[DEFENSE COUNSEL]:     I think that satisfies Count 1, Your Honor.

[THE STATE]:     As to the dollar threshold I don't know that it does.

THE COURT:     The amount of the transactions.

[BY DEFENSE COUNSEL]:

Q     The amount of the transactions were in excess[] of $500,000.  Is that correct?

A     That's correct.

[THE STATE]:     The State's satisfied, Your Honor.

A-0724-17T1

[BY DEFENSE COUNSEL]:

Q    Now, [defendant], while operating and managing these centers, did you also conspire with other individuals in the making of payments to physicians?

A    Yes.

Q    And these other individuals with which you conspired, were they Humara Paracha?

A    Yes.

Q    And also Faisal Paracha?

A    Yes.

Q    And also Jose Lopez?

A    Yes.

Q    And also Felix Clarin?

A    (No verbal response given)

Q    No.

A    No.

Q    Okay.  With respect to the . . . conspiracy, was it the object of that conspiracy that one or more of you would pay doctors?

A    Yes.

Q    And what was the purpose of paying the doctors?

A-0724-17T1

A     To receive referrals back to the centers.

Q     And how much did you pay doctors?

A     Anywhere between $50 and $150 per --

Q     And was that per scan?

A     -- per study.  Per study, yes.

Q     And as a result of paying these physicians, did you receive a benefit through insurance billing?

A     Yes.

Q     And was that benefit, the monetary value in excess of $75,000?

A     Yes, it was.

Q     Did you personally make money payments to doctors, as well?

A     Yes, I did.

Q     And was of [sic] those doctors Dr. Simon Santos?

A     Yes.

Q     And was that during the period of approximately May 28, 2010 through June 16, 2014?

A     Yes.

[DEFENSE COUNSEL]:     I believe that's adequate, Your Honor.

A-0724-17T1

THE COURT:     State.

[THE STATE]:   Was the -- not whether the compensation but was the sum of the kickbacks or payments to the doctors greater than 75,000?

THE DEFENDANT:     I'm sorry?

[BY DEFENSE COUNSEL]:

Q     Was the total amount of money that you, as part of the conspiracy, paid the doctors in excess of $75,000?

A     Yes.  Yes, it was in excess.  Yes.

Additionally, the judge and defendant engaged in the following exchange:

Q     Do you also understand that the Court could, in its discretion, impose a minimum time in confinement to be served before you become eligible for parole, which could be as long as one-half of the total custodial sentence imposed?

A     Yes.

Q     And do you also understand that you're pleading guilty to a charge that requires a mandatory period of parole ineligibility or a mandatory extended term?  That minimum period of parole ineligibility is one year and eight months and the maximum period of parole ineligibility is four years and this period cannot be reduced by good time, work time, or minimum custody credits.  Do you understand that?

A     Yes.

10

When defendant was sentenced, over two years later on September 6, 2017, he had testified in two trials, and provided information that enabled the State to prosecute eighteen others. He had also been extensively interviewed by investigators, and made inculpatory statements under oath regarding his own involvement in the medical insurance frauds. Defendant was thus sentenced to the post-cooperation minimum term — eight years, with thirty-two months of parole ineligibility on the first-degree offense, concurrent to six years on the second-degree crime. The JOC required defendant, along with two co-defendants, to pay $1,000,000 in restitution to the Treasurer of the State of New Jersey.

As per the May 11, 2015 Bergen County plea form, defendant would plead to the first count of the indictment, which the judge sua sponte amended from second-degree to third-degree conspiracy to commit theft by deception. For that offense, defendant would serve five years concurrent to the Morris County sentence.

Defendant filed two motions for leave to withdraw his guilty plea in Morris County. By way of context, defendant's financial records had been seized by the State, but were ordered to be returned or made available to him for copying first on October 1, 2014, and again on March 13, 2015, in various civil

11

suits filed against him by aggrieved insurance companies. Six days prior to the entry of his guilty plea in Morris County, defendant told a prosecutor's investigator that the amount he owed Aetna due to his criminal conduct was based on tax insurance numbers (TINs). Furthermore, in civil lawsuits of which the court took judicial notice in the first motion to withdraw a guilty plea, defendant admitted that Allstate paid his facilities $1,783,628.62 in claims, and that Encompass, an Allstate affiliate, paid his facilities $359,496.77. Defendant also told the investigator that he knew Aetna sought the return of overages only for improper TINs reimbursals of up to $400,000.

The judge noted, when defendant first moved to withdraw his guilty plea alleging the amount owed to Aetna did not satisfy the first-degree threshold of $500,000, that he provided unnumbered printouts in support of his application spanning from early 2012 to April 2014. The accusation, however, alleged conduct beginning on May 28, 2010, and ending on June 6, 2014. The judge did not consider the printouts to be dispositive.

Defendant's first motion for leave to withdraw his guilty plea was heard on June 14, 2017. His contention was that once he reviewed his records, it became clear that Aetna was demanding only $413,136.20, not the $500,000

necessary for a first-degree facilitation offense, and hence the factual basis for the entry of the plea was inadequate, and the plea should be vacated.

The judge denied the motion in part because defendant had the Aetna records at least two months before he entered the guilty plea, and more than two years before the motion was filed. Furthermore, the application was made approximately a month after defendant was denied admission to drug court. The judge had read the interview in which defendant acknowledged, before the entry of the plea, that reimbursement for Aetna was less than $500,000. After reviewing the materials provided to him by both sides, the judge concluded that the factual basis was adequate and that defendant could not credibly claim he had been unaware of the amounts Aetna sought to recoup. When interviewed on at least one occasion, defendant suggested to an investigator that he may have misused TINs when submitting claims to insurers other than Aetna. The judge therefore also presumed that the wrongful claims to the other companies may have encompassed misuse of TINs.

Turning to the Slater[2] factors, the judge not only referenced the rejection from drug court as a significant motivator for defendant's motion to withdraw

---

[2] State v. Slater, 198 N.J. 145 (2009).

from his guilty plea, but also the complete absence of any colorable claim of innocence. The timing of the motion was suspect because defendant's wife, whom the State recommended be placed on probation pursuant to defendant's plea agreement, had already been sentenced. The judge observed that the State would suffer substantial prejudice because of the many years of false claims that would have to be reconstructed years after the events. All the co-defendants' matters were disposed of by the time the motion was filed. Thus, the judge opined the Slater standard was not met and denied the motion.

With the assistance of a new attorney, defendant filed a second motion in Morris County to withdraw his guilty plea. Defendant argued that his prior attorney did not advise him that a second-degree offense did not include mandatory parole ineligibility, an issue not raised on the first motion. During the second motion, defendant relied principally on the earlier claim that the amount in controversy was less than $500,000, and thus no adequate factual basis existed for the plea.

In denying the second motion, the judge reiterated that defendant had the relevant records months before the 2015 plea agreement. Defendant, he concluded, knew or should have known of the discrepancy, if one existed. After

that second motion was denied,[3] the judge scheduled defendant's sentence. During the sentence proceeding, the judge noted that GEICO sought $868,000 in restitution, and that Allstate and its affiliates in combination sought millions.

In the Bergen County motion to withdraw, defense counsel contended that defendant did not establish an adequate factual basis for that crime either. Defendant acknowledged during his plea that he operated and managed a radiology center in Clifton, which was a facility that used equipment including an MRI covered by insurance. In reviewing the transcript, the court noted that although defendant acknowledged deception in submitting a claim without any actual entitlement, he did not specify the dollar amount. The judge concluded that even though the factual basis was inadequate to establish a second-degree crime, the equipment at issue, and thus the dollar value of the fraudulent claim, placed the crime in at least the third-degree range. As a result, he decided that, pursuant to State v. Tate, 220 N.J. 393, 403-04 (2015), there was no proof of the $75,000 loss but there was "at least a third-degree offense." Accordingly, the judge sentenced defendant, albeit to the negotiated term of years, to an amended third-degree offense, not the second-degree.

---

[3] Defendant was not present at the motions to withdraw a guilty plea, having been taken to the hospital emergency room shortly before argument.

A-0724-17T1

Now on appeal of the Morris County plea, defendant raises the following points:

POINT ONE
THE COURT ERRED IN DENYING DEFENDANT'S PRE-SENTENCE MOTION TO WITHDRAW HIS GUILTY PLEA.

A. IN CONSIDERING THE DEFENDANT'S COLORABLE CLAIM OF INNOCENCE, THE COURT ERRED IN FAILING TO FIND THAT THE EVIDENCE PROVIDED BY THE DEFENDANT PROVES THAT HE COULD NOT HAVE COMMITTED A FIRST-DEGREE CRIME.

B. IN CONSIDERING THE DEFENDANT'S COLORABLE CLAIM OF INNOCENCE, THE COURT ERRED IN FAILING TO FIND THAT THE FACTUAL BASIS PROVIDED BY THE DEFENDANT WAS SUFFICIENT IN LIGHT OF THE EVIDENCE OF THE CLAIMS FROM AETNA.

C. IN CONSIDERING SLATER FACTOR TWO, THE REASON FOR THE DEFENDANT'S FILING OF HIS MOTION TO WITHDRAW, AND SLATER FACTOR FOUR, THE PREJUDICE OR ADVANTAGE TO THE PARTIES, THE COURT ERRED IN FAILING TO APPLY THE LESS STRINGENT STANDARD WHICH APPLIES TO ALL MOTIONS TO WITHDRAW A PLEA BEFORE SENTENCING.

D. THE COURT ERRED IN FAILING TO CONDUCT AN EVIDENTIARY HEARING WHERE THE DEFENDANT COULD HAVE ESTABLISHED THAT THE CLAIMS BY AETNA COULD NOT

16

HAVE AMOUNTED TO A FIRST-DEGREE OFFENSE.

E. THE COURT ERRED IN FAILING TO ADDRESS THE MAY 18, 2017 LETTER FROM AETNA WHICH NOW STATES THAT . . . BOTH FACILITIES WERE, IN FACT, LOCATED IN AN OUT OF NETWORK AREA AND THEREFORE USE OF THE WRONG TIN WOULD NOT AFFECT THE BILLING AMOUNT.

POINT TWO
THE PLEA AGREEMENT MUST BE VACATED BECAUSE THE STATE HAS REFUSED TO HONOR THE AGREEMENT.

A. THE PLEA MUST BE VACATED BECAUSE THE STATE HAD REFUSED TO WRITE AN IMMIGRATION LETTER AS REQUIRED UNDER THE PLEA AGREEMENT.

B. THE PLEA MUST BE VACATED BECAUSE THE STATE HAD REFUSED TO WRITE A PAROLE LETTER AS REQUIRED UNDER THE PLEA AGREEMENT.

POINT THREE
THE SENTENCE IMPOSED IS MANIFESTLY EXCESSIVE.

On appeal of the Bergen County matter, defendant raises these points:

POINT ONE
THE PLEA AGREEMENT MUST BE VACATED BECAUSE THE STATE HAS REFUSED TO HONOR THE AGREEMENT.

17

<u>POINT TWO</u>
THE SENTENCE IMPOSED IS MANIFESTLY
EXCESSIVE.

Appellate courts review de novo a trial court's denial of a defendant's motion to withdraw his guilty plea based on an inadequate factual basis.  <u>Tate</u>, 220 N.J. at 403-04 (citing <u>Manalapan Realty, L.P. v. Twp. Comm.</u>, 140 N.J. 336, 378 (1995)).  Like the trial court, we only assess whether "the factual admissions during a plea colloquy satisfy the elements of an offense."  <u>Id.</u> at 404.

I.

A.

We address defendant's points on appeal as to the Morris County agreement simultaneously.  Defendant contends that once he realized he had entered a guilty plea to a lesser offense, he should have been allowed to withdraw.

The accusation alleges defendant:

> did, with the intent to facilitate or promote criminal activity, direct, organize, finance, plan, manage, supervise, or control the transportation of or transactions in property known or which a reasonable person would believe to be derived from criminal activity in an amount greater than $500,000.00; that is, the said REHAN ZUBERI did direct, organize, finance, plan, manage, supervise, or control the transaction of more than $500,000.00 that was known or which a reasonable person would believe to be derived from

criminal activity, particularly Health Care Claims Fraud by altering the TIN of the location where MRI services were provided to increase reimbursements, and the said REHAN ZUBERI engaged in transactions that he knew were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership or control of the property derived from criminal activity or to avoid a transaction reporting requirement, and the said financial transactions were designed to facilitate or promote the criminal activity of Health Care Claims Fraud, contrary to the provisions of N.J.S.A. 2C:21-4.3c and against the peace of this State, the government, and dignity of the same.

We do not disagree that defendant's factual basis could have included more detail. Neither the judge nor the attorneys asked defendant open-ended questions that elicited the full picture of the fraud in defendant's own words as charged in the accusation. The accusation states that defendant engaged in various behaviors constituting wholesale financial facilitation of healthcare claims fraud. But by adhering to leading questions narrowly focused on TINs, the groundwork was laid for defendant's contention that the factual basis was inadequate. When establishing a factual basis, defendants are too often asked the narrowest of leading questions requiring only a yes or no response, which sets the stage for later motion practice.

But this is an unusual case. This defendant knew the exact proofs the State had against him — it was, after all, documentation taken from his

19

A-0724-17T1

businesses. Defendant would learn nothing new from discovery, unlike other prosecutions. Defendant had the specific records he referred to in his plea allocution in his possession days, if not months or years, before the entry of his guilty plea. Defendant, when interviewed by an investigator before his guilty plea, said that the Aetna claims could be between $200,000 and $400,000. That range is less than a first-degree crime, and defendant knew it.

Defendant was intimately familiar with the State's allegations, had the proofs in his possession, and readily confessed before the plea. Having the information before the entry of the plea means defendant clearly, indisputably knew or should have known the amounts in question.

Putting together side-by-side the judge's plea colloquy with the language of the accusation, however, it is clear defendant did plead guilty to the offenses charged in the accusation, which overall exceed $500,000. Early in the plea colloquy, the judge asked defendant simply if he committed the offenses to which he was pleading guilty. Defendant's response was "Yes, I did." The accusation does not merely allege a fraud by use of TINs — it alleges the frauds perpetrated by engaging in transactions defendant knew were "designed, in whole or in part, to conceal or disguise the nature, location, source, ownership or control of the property derived from criminal activity or to avoid a transaction

20

reporting requirement, and the said financial transactions were designed to facilitate or promote the criminal activity of Health Care Claims Fraud, contrary to the provisions of N.J.S.A. 2C:21-4.3c . . . ." The judge's question and defendant's response, when read in tandem with the accusation, demonstrates that defendant acknowledged more than just the TINs claims submitted to Aetna. He acknowledged committing wrongful transactions other than just abuse of TINs. His own attorney — while making specific reference to the TINs — also asked him, and he acknowledged, committing healthcare fraud in amounts exceeding $500,000. Even if we were to entertain for the sake of argument that the use of TINs was the limited basis for the entry of the guilty plea, the fact Aetna separately sought to recover less than $500,000 from defendant does not prove he defrauded the insurer by that amount.

To allow defendant to withdraw from the plea based on a lack of adequate factual basis at this stage would allow him to manipulate the system once he had received all the benefits of his plea agreement – and the State would be left in a worse position than before the plea was entered. Defendant raised no defenses during his plea allocution. This is a sophisticated individual who is not an innocent person being punished for a crime he did not commit. See Tate, 220 N.J. at 405. The strained reading of the plea colloquy he now urges is illogical.

21

When he entered his guilty plea, defendant did not distance himself from the "distasteful reality" of a multi-million dollar medical insurance fraud scheme he initiated not long after being released from prison for similar conduct. See ibid.

Since we reject defendant's claim that no adequate factual basis was proffered, we next consider whether withdrawal from the guilty plea is warranted pursuant to State v. Slater, 198 N.J. at 145. Like the Law Division judge, we conclude defendant has not met that four-prong test. See id. at 157-58.

In denying defendant's motion, the judge thoroughly analyzed those four prongs. They are "(1) whether the defendant has asserted a colorable claim of innocence; (2) the nature and strength of defendant's reasons for withdrawal; (3) the existence of a plea bargain; and (4) whether withdrawal [will] result in unfair prejudice to the State or unfair advantage to the accused." Ibid.

We review appeals from Slater motions for abuse of discretion. State v. Munroe, 210 N.J. 429, 448 (2012). Guilty pleas are vacated at the trial court's discretion. Slater, 198 N.J. at 156 (citing State v. Simon, 161 N.J. 416, 444 (1999)). The motion was made pre-sentence, meaning it should be vacated if the "interest of justice would not be served by effectuating the agreement." R. 3:9-3(e); see Slater, 198 N.J. at 158.

No abuse of discretion was committed by the court here. Defendant failed to meet the first prong of the Slater test. He does not claim innocence — he merely disputes the dollar amount of his fraud as to one insurer. As to the second factor, the judge made appropriate "qualitative assessments about the nature of [] defendant's reasons for moving to withdraw his plea and the strength of his case and . . . ma[de] credibility determinations . . . ." Tate, 220 N.J. at 404. Although not the judge who accepted defendant's guilty plea, the judge who denied the motions to withdraw and for reconsideration had a nuanced understanding of the case. Defendant's application followed his rejection from the drug court program and his wife obtaining the benefit of his bargain by virtue of her probationary sentence. The third factor, that a plea bargain exists, is not in dispute. As to the fourth factor, the judge found the State would be severely prejudiced if defendant were permitted to withdraw because of the difficulties associated with recreating a paper trail for thousands of medical claims submitted by several MRI centers beginning in 2010. It would result in an unfair advantage to defendant. The judge's reasons were supported by the record and legally sound. No abuse of discretion occurred.

A-0724-17T1

B.

Defendant also claims his sentence was excessive. In sentencing, however, the judge thoroughly reviewed defendant's circumstances, the offense, and the applicable law. With ample support in the record, he found: aggravating factor three, the likelihood of re-offense; five, the substantial likelihood that defendant was involved in organized crime; six, defendant's prior criminal history; and nine, the need to deter. He also found mitigating factor six because defendant agreed to significant restitution jointly and severally with others; eleven because his absence would cause hardship to his family, including his elderly parents; and twelve because he cooperated with the authorities in the prosecution of others. N.J.S.A. 2C:44-1(a), (b). We do not substitute our judgment for that of the sentencing court so long as each factor is supported by the evidence. See State v. Fuentes, 217 N.J. 57, 70, 72 (2014). Even though the judge opined the aggravating factors outweighed the mitigating factors, the judge nonetheless gave defendant the benefit of the doubt and imposed the negotiated sentence. Defendant's imprisonment of eight years with eight months of parole ineligibility, concurrent to six years, was neither a clearly mistaken sentence nor shocks our conscience. See State v. Pierce, 188 N.J. 155, 166-67 (2006); State v. Roth, 95 N.J. 334, 364-66 (1984). The judge followed the

24

sentencing guidelines, grounded his findings regarding the aggravating and mitigating factors on competent, credible evidence in the record, and reasonably applied the sentencing guidelines.

## II.

In the Bergen County appeal, defendant first challenges the State's failure to produce the letters negotiated as part of the plea agreement. We were advised at oral argument, however, that the letters have been supplied, making defendant's argument moot. See Betancourt v. Trinitas Hosp., 415 N.J. Super. 301, 311 (App. Div. 2010) ("A case is technically moot when the original issue presented has been resolved, at least concerning the parties who initiated the litigation.") (internal citations omitted).

Defendant also challenges the sentence as excessive. Although the Bergen County judge denied defendant's motion to withdraw the guilty plea due to the alleged failure to establish a factual basis, he reduced the offense from a second-degree to a third-degree crime upon reviewing the proofs. He sentenced defendant to the same five-year term, concurrent to the Morris County sentence, called for by the agreement after thoroughly canvassing the record. He found aggravating factors three, six, and nine, and mitigating factors six, eleven, and twelve. See N.J.S.A. 2C:44-1(a), (b). The Bergen sentence, the product of the

A-0724-17T1

judge's thoughtful weighing of aggravating and mitigating factors, was also supported by the competent, credible evidence in the record. See Fuentes, 217 N.J. at 72. It was not clearly mistaken. It adhered to the guidelines and does not shock our conscience. See Pierce, 188 N.J. at 166-67; Roth, 95 N.J. at 364-66.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0724-17T1